IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

**PHAN MINH TRANG; NGUYỄN THỊ
PHỤNG; NGUYỄN MINH LAN; BÙI THỊ
NGỌC BÍCH; LÊ THIỆN KÍNH; VU THỊ
THU HÀ; LÊ THI TRINH; VÕ THỊ
THOA; HOANG THE DUY; NGUYỄN
ĐỨC HUY; NGÔ QUANG VINH; DƯƠNG
ĐỨC THẮNG; HỒ THI KHOA TRANG;
NGUYỄN THỊ MINH; NGÔ DAI HẢI;
NGUYỄN KIM LOAN; ABHISHEK
SINGLA and NGUYỄN THANH TÚ
VINH,** each a resident of the Socialist
Republic of Vietnam

                Plaintiffs,

     v.

**DMPT, LP**, a Virginia limited partnership;
**RED LEAF DEVELOPMENT, LLC**, a
Virginia limited liability company; **RJ
CAPITAL, LLC,** a Virginia limited liability
company **JPMCANUS LP,** a Florida Limited
Partnership; **AMERICAN
INTERNATIONAL & IMMIGRATION
LAW GROUP, P.C. d/b/a ROBERT LUBIN
& ASSOCIATES, P.C.**, a Virginia
professional corporation; **ROBERT LUBIN**,
an individual;  **PAUL RUBY**, an individual;
**GOLDEN LAMP REGIONAL CENTER,
LLC**, a Utah limited liability company; and
**ATLANTIC UNION BANK** as successor in
interest to Washington First Bank,

              Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Phan Minh Trang, Nguyễn Thị Phụng, Nguyễn Minh Lan, Bùi Thị Ngọc Bích, Lê Thiện Kính, Vu Thị Thu Hà, Lê Thi Trinh, Võ Thị Thoa, Hoang The Duy, Nguyễn Đức Huy, Ngô Quang Vinh, Dương Đức Thắng, Hồ Thi Khoa Trang, Nguyễn Thị Minh, Ngô Dai Hải, Abhishek Singla, Nguyễn Kim Loan, and Nguyễn Thanh Tú Vinh (collectively, "Plaintiffs"), by counsel, pursuant to Fed. R. Civ. P. 8, bring this Complaint against Defendants DMPT, LP ("DMPT"), Red Leaf Development, LLC ("Red Leaf"), RJ Capital, LLC ("RJC"), JPMCanus LP ("JPM"), American International & Immigration Law Group, P.C. ("AIIL"), Robert Lubin ("Lubin"), Paul Ruby ("Ruby"), Golden Lamp Regional Center, LLC ("Golden Lamp") (collectively the "Lubin/Ruby Defendants") and Atlantic Union Bank as successor in interest to Washington First Bank (collectively, "Defendants"), and allege as follows:

## OVERVIEW OF ACTION

1.      This matter involves negligence, irreconcilable conflicts of interest, breaches of contract and fiduciary duties of Defendants in connection with an ill-conceived EB-5 project in Denver, Colorado. Defendants' overly ambitious mixed-use development was marketed to EB-5 investors as a "can't lose" redevelopment of the El Jebel Shrine Temple at 1770 Sherman Street (the "Temple") into a "family entertainment center," together with a 350-unit mixed-use tower (the "Tower") in Denver, Colorado (collectively the "Project"). It is now in foreclosure due mostly to the fact that the corporate components of the Project were used as an ATM for unauthorized, illegal transfers to prop up other failing EB-5 projects in which many of the Defendants were involved and, in some instances, controlled.

2.      The investment vehicle for the Project for EB-5 investors was DMPT. DMPT was controlled by Red Leaf, Lubin and Golden Lamp. The EB-5 Regional Center for the Project,

Golden Lamp, was supposedly operated by two Utah real estate executives, but in fact was operated by Lubin and his AIIL law partner, Ruby, serving as its "Director." As Defendants Lubin, Ruby and AIIL knew when soliciting Plaintiffs to invest in it, the Project was doomed from the outset and rife with irreconcilable conflicts of interests that could not be signed away, including ***Ruby's wife*** inexplicably providing legal services to the Project through her law firm without any disclosure to investors.

3.      Seventeen (17) Vietnamese investors and one Indian national investor—the Plaintiffs—each invested $500,000 in capital in the Project, along with administrative fees of $50,000 to Golden Lamp, based on what Plaintiffs now know to be purposefully misleading and empty promises by Defendants, such as (a) EB-5 compliance, (b) abundant "cushioned" job creation (projected 782 jobs for up to 58 investors), (c) return of capital after immigration milestones or within five years, and that, (d) refunds would be provided upon certain immigration denials.  Due to the wrongful conduct of Defendants, virtually all these promises failed to materialize.  Plaintiffs have received no return of capital, and only one of them has been credited with any jobs towards EB-5 benefits. Lubin now faces litigation and bar complaints, while Ruby closed his Virginia law practice and moved to Tennessee.

4.      As Plaintiffs have come to learn in 2025, the Project was used as an ATM and money exchange as early as 2017 not only for the Project itself but others in which Lubin and Ruby were involved.  Lubin himself has essentially admitted that investors' funds cannot be properly tracked, so much so that he hired his own forensic examiner to trace funds through the escrow and banking activity Defendant Atlantic Union Bank (successor to Washington First) was supposed to supervise. Only very recently have Plaintiffs and other investors come to learn that

millions of dollars were diverted to "development" of an already completed and operating hospital in metropolitan Atlanta.[1]

5.    Notwithstanding the feigned promises peddled to Plaintiffs and others, the Lubin/Ruby Defendants caused an *ultra vires* transfer of the Temple from DMPT to Denver Temple, LLC in December 2020 and sold the Temple in January 2023 for $9.845 million, *without returning **one dime to Plaintiffs** or creating additional jobs for promised EB-5 immigration benefits.*

6.    Neither the Tower nor much of anything was ever constructed for the Project that would benefit all its EB-5 investors. Instead, Defendants issued or instructed others to issue false and misleading updates between 2018 and 2025 claiming construction was imminent and that "more than 600" jobs would be created while concealing the transfer and sale of the core asset from EB-5 investors.

7.    The Project is now in foreclosure.  In what can only be described as quixotic and irrational behavior, Lubin continues to tout his expertise in an effort to develop the Project despite having less than $50,000 on hand to do so.  See ***Exhibit "1"***.

8.    Lubin, and thus the entities he managed, controlled, and represented, had irreconcilable conflicts of interest that rendered the breached investment contracts at issue voidable under federal securities laws and the common laws of the Commonwealth of Virginia. Lubin impermissibly assumed simultaneous roles in (a) marketing, operating, and managing the Project and its manager, (b) serving as immigration counsel, (c) serving as corporate and securities counsel

---

[1] Lubin is facing at least two bar complaints by an investor in a similar project for almost-identical misconduct.  *See **Exhibit "7,"** infra.*

for the Project while (d) minimizing irreconcilable conflicts of interest by marketing himself as an efficient "one-stop shop" for EB-5 investors.

9.      Likewise, Ruby was conflicted by serving as an immigration attorney at AIIL for investors in the Project, while simultaneously serving as an officer of Golden Lamp as Lubin's proxy.   Further, the Project hired Ruby's wife for legal work without disclosing the conflict that engagement presented to investors.  All of these irreconcilable conflicts of Lubin and Ruby were either undisclosed or non-waivable under Virginia attorney ethics rules, and instead weaponized to keep EB-5 investors such as Plaintiffs in the dark so that Defendants could do as they pleased with Plaintiffs' money without any real-time accountability.

10.      In this action, Plaintiffs seek (a) rescission of their investments, (b) an accounting and (c) damages for the ill-conceived, irreconcilably conflicted placement of securities in the Project. In sum, the Project was promoted, validated, operated, managed, controlled and counseled by the Lubin/Ruby Defendants and the entities they controlled, including Golden Lamp. None of the conduct that is a direct and proximate cause of Plaintiffs' injuries would have occurred but for the substantial assistance in the scheme by Defendant Atlantic Union Bank.

11.      Plaintiffs request (a) actual damages, or in the alternative rescission of their investments in an amount of at least $9.35 million, (b) an equitable lien on the Project's property, (c) punitive damages, (d) a full accounting of their misdirected invested funds and (e) the appointment of a Receiver as this Court may deem proper.

## JURISDICTION AND VENUE

12.      This Court may exercise subject-matter jurisdiction pursuant 28 U.S.C. § 1331 because Plaintiffs assert claims under the Securities Exchange Act of 1934 ("1934 Act") Sections

10(b) and Rule 10b-5 promulgated thereunder, and Sections 20(a) and Section 29, thus invoking Section 27.   Section 27 of the 1934 Act provides that federal district courts have exclusive jurisdiction over violations of the 1934 Act and the rules and regulations promulgated thereunder.

13.    Alternatively, diversity jurisdiction exists in this case under 28 U.S.C. § 1332(a)(2) because Plaintiffs are foreign nationals, Defendants are U.S. citizens or entities, and the amount in controversy exceeds $75,000 for each Plaintiff.

14.    Supplemental jurisdiction exists under 28 U.S.C. § 1367 for state-law claims under Virginia law.

15.    Defendants each transacted business regarding the Project in the Commonwealth of Virginia and are therefore subject to personal jurisdiction and the corporate defendants were created and/or operated in the Commonwealth of Virginia.

16.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts and occurrences giving rise to the claims occurred in this District.

17.    Due to the pervasiveness of fraud and mismanagement of the Project and the irreconcilable, non-waivable conflicts that were wrongfully sought and obtained under Virginia law, none of the Defendants may lawfully invoke arbitration clauses in any operative agreements in this matter that are voidable and rescindable under the law of the Commonwealth of Virginia.

## PARTIES

18.    The Plaintiffs are each Vietnamese nationals and one Indian national who invested in the Project through DMPT as limited partners.

19.     Defendant DMPT is a Virginia limited partnership formed on August 25, 2014, with its principal place of business at 620 Herndon Parkway, Suite 110, Herndon, Virginia 20170. DMPT was the investment vehicle for the Project, is currently active in Virginia and has been delinquent in its foreign registration in Colorado since July 1, 2021. As stated in the LPA, DMPT was formed to "engage in the development of a multi-purpose tower in Denver, Colorado."  The corporate documents filed in Virginia for DMPT are attached hereto as ***Exhibit "2."***

20.     Defendant Red Leaf is a Virginia limited liability company formed in 2013 and served as the general partner and developer of DMPT, with its principal place of business at 620 Herndon Parkway, Suite 110, Herndon, Virginia 20170. Red Leaf is managed and controlled by Lubin, and it is active in Virginia and managed the Project in Colorado, including decisions to alter its scope and sell assets based in Colorado.  Red Leaf also serves as the general partner for other EB-5 projects peddled by Lubin and Ruby.  Corporate records publicly available in Virginia for Red Leaf are attached hereto as ***Exhibit "3."***

21.     In recognition of the Project's dismal financial condition, Lubin and JPM caused Red Leaf to withdraw as the General Partner of DMPT, given that Red Leaf served as the general partner for other projects under the influence of the Lubin/Ruby Defendants.  On January 1, 2023, and undisclosed to Plaintiffs and other investors, RJ Capital LLC  assumed the role of general partner of DMPT.  RJC is a Virginia Limited Liability Company housed in Lubin's office.  Lubin is the Managing Member of RJC.  See ***Exhibit "4"***.

22.     Defendant JPM is a Florida Limited Partnership with its principal place of business at 390 Notre-Dame West, Suite 410, Montreal, Quebec, Canada and may be served with process at 801 US Highway 1, North Palm Beach, Florida 33408.  JPM is a control person and shareholder

of Red Leaf.  JPM shares the same office address as that of Mercan Group ("Mercan Group"), an immigration advisory firm that marketed the Project.  Both Mercan Group and JPM share Jerry Morgan, a Canadian national, as their CEO.  Forensic review of banking records of the Project reflects the transfers of hundreds of thousands of dollars out of DMPT to Mercan Group.  The most recent corporate records for JPM available through the Florida Department of State, Division of Corporations, is attached as ***Exhibit "5."***

23.     Defendant Lubin is the founder and current owner of law firm AIIL who practiced law in Reston, VA during most of the events and occurrences alleged herein.  Lubin has been a lawyer licensed by the Virginia State Bar since 1994.  He curtly resides at 2601 Inyaha Lane, La Jolla, CA.

24.     Defendant AIIL is a Virginia professional corporation with its principal place of business at 620 Herndon Parkway, Suite 110, Herndon, Virginia 20170.  Owned and operated by Lubin, AIIL provided numerous Plaintiffs with immigration services and promoted the Project to all Plaintiffs, including preparing or assisting preparing I-526 petitions based on misrepresented Project details AIIL through Lubin and Ruby provided or recited.  Corporate Records from the Virginia Corporation Commission regarding AIIL are attached hereto as ***Exhibit "6."***

25.     Defendant Atlantic Union Bank served as the escrow agent, with its principal place of business located at 1051 East Cary Street, Suite 1200, Richmond, VA 23219. As the Defendants' escrow bank, it knowingly facilitated the regular and improper use of Plaintiffs' money by Defendants in this EB-5 scheme. Atlantic Union is a Virginia Corporation that previously operated as and is the successor in interest to WashingtonFirst Bank. Atlantic Union's actions in permitting the improper washing of Plaintiffs' money in violation of its escrow

obligations provided the patina of legitimacy that served to validate the improper use of Plaintiffs' money by Defendants.

26.    At all relevant times to his misconduct alleged here, Defendant Lubin has been the managing member of Red Leaf, a control person of the Project through Red Leaf, managing principal of AIIL and, on information and belief, a *de facto* control person of Golden Lamp. Lubin oversaw the solicitation of immigration law clients, investments to those clients, management of DMPT and EB-5 compliance of the Project and the Regional Center, creating irreconcilable conflicts of interest similar to those alleged in his known pending Virginia State Bar ("VSB") disciplinary proceedings (VSB Docket Nos. 24-053-132345 and 24-053-130896) attached hereto as ***Exhibit "7"***.  In these matters, Lubin faces charges of misconduct in another EB-5 project he managed for his immigration law clients that, as here, was structured to conceal conflicts of interest and supported by impermissible conflict waivers. Lubin faces a VSB misconduct hearing on October 24, 2025 in which Bar Counsel is expected to recommend a punishment of revocation of his license to practice law.

27.    Defendant Paul Ruby is an attorney now residing in metropolitan Nashville, Tennessee, whose business address is 1507 16th Ave South, Suite 203, Nashville, TN.  Ruby formerly served as Lubin's partner in AIIL and assisted Lubin with the handling of conflicts of interest for AIIL, the Project and Golden Lamp.  Ruby also served as a Director of Golden Lamp and, on information and belief, served as Lubin's proxy to conduct business affairs for Golden Lamp in its oversight of the Project, further exacerbating the irreconcilable conflicts prohibited under Virginia's rules of professional conduct. Included among these violations was Ruby's undisclosed hiring of his wife to provide legal services to the Project.  As stated in the VSB certification, ***both Ruby and Lubin*** informed those who retained AIIL that "our various

responsibilities constitute a conflict of interest, because my law firm shall file your (and if applicable your family's) immigration case and Mr. Ruby and I have an interest in GBR," despite their unwaivable conflicts. *Exhibit 7, ¶ 9.*

28.      Defendant Golden Lamp is a USCIS-designated EB-5 regional center based in Utah, located at 6720 Buena Vista Dr., Ogden, UT.  Golden Lamp sponsored the Project and facilitated EB-5 compliance by endorsing the PPM's job creation projections. It is currently active and, on information and belief, is controlled by Lubin through Ruby as its President with the acquiescence of its actual owners.  Golden Lamp appears to have never been authorized to conduct business in either Colorado or Virginia. The latest corporate filings of Golden Lamp in Utah are annexed hereto as *Exhibit "8."*

29.      As applicable, Plaintiffs assert equitable tolling of any and all applicable statutes of limitation in this matter due to the extraordinary circumstances surrounding the misconduct of what are now known to be related parties and fraudulent concealment of facts regarding such matters.

## NON-PARTIES

30.      Debra Wickizer and Wayne Wickizer (collectively "the Wickizers") are the actual owners of Golden Lamp.  They are also control persons and officers of Golden Lamp.  See *Exhibit "9."*  As control persons of Golden Lamp as that term is defined under federal and state securities laws, the Wickizers had the capacity and power to influence the business affairs of Golden Lamp. On information and belief, they both acquiesced to the operation and control of Golden Lamp by Ruby and ultimately Lubin.

## STATEMENT OF FACTS

**The EB-5 Program**

31.    The U.S. Immigrant Investor Program, (the "EB-5 Program") provides a mechanism for legal permanent residency in the United States to foreign nationals who invest in U.S.-based projects. See 8 U.S.C. § 1153(b)(5)(A)(ii). Generally, qualified immigrants may gain U.S. visas through direct investment of at least $500,000 (in targeted employment areas at all relevant times) in a new commercial enterprise that creates at least 10 full-time jobs for U.S. workers. *Id.* at §§ 1153(b)(5)(A) and (C).

32.    EB-5 Investments are typically made by foreign nationals directly or indirectly through USCIS-approved regional centers like Golden Lamp, which permit counting indirect jobs toward the requirement.  As explained in the PPM for the Project (Attached hereto as ***Exhibit "10"***), the EB-5 Program requires funds to remain "at risk" and be deployed into a job-creating enterprise.

33.    EB-5 Regional Centers such as Golden Lamp coordinate the investments of EB-5 investors into a pooled entity, which then deploys the funds directly to the developer. These pooled entities are typically structured as limited partnerships whose sole purpose is to loan money to the actual project.  Each of the EB-5 investors are ultimately limited partners in the pooled entity that is lending money to the Project.  Once there is a liquidity event or sufficient cash flow, the loan is repaid to the pooled entity, and thus the EB-5 investors are repaid. This oft-used structure in EB-5 investments provides the legal patina required to comply with the EB-5 Program's requirements while simultaneously facilitating investment by EB-5 investors into qualifying projects with a reasonable expectation of return of one's investment capital.

34.     After approval of the initial I-526 petition of EB-5 investors by USCIS, those investors receive conditional permanent residence status for a period of two years. Before the filing of Form I-829 with USCIS, known as Petition by Entrepreneur to Remove Conditions on Permanent Resident Status, the EB-5 Regional Center is required to demonstrate that the immigrant's capital contribution was in a job-creating commercial enterprise that created at least 10 qualified full-time positions in the U.S., either directly or indirectly based on accepted economic models. EB-5 Projects often use independent economists to model job creation estimates.

35.     After an EB-5 investor demonstrates to USCIS that his or her capital contribution was invested into a job-creating entity that produced at least 10 qualified direct or indirect full-time jobs for U.S. workers, the EB-5 investor (and their immediate family) is granted U.S. lawful permanent residency through the filing and approval of an I-829 petition.

36.     In 2015, the PPM was authored and/or approved by the Lubin/Ruby Defendants and was designed to induce Plaintiffs (and others) to invest in DMPT for the Project. The Project's success depended on the renovation of the historic El Jebel Shrine Temple at 1770 Sherman Street, Denver, CO, into a family entertainment center, and the construction of the Tower.

37.     The PPM authored and/or approved by the Lubin/Ruby Defendants estimated the total costs of renovation and construction of the Project to be $154.9 million, with EB-5 funds providing partial financing. This PPM also represented to EB-5 investors that the Project's business plan (also drafted by AIIL and approved by the Lubin/Ruby Defendants) supported projections for the creation of 782 direct and indirect jobs to far exceed EB-5 requirements for up to 58 investors. The PPM stated: "The Limited Partnership is operating in cooperation with the

Golden Lamp Regional Center, LLC EB-5 Regional Center ('RC') and each prospective investor shall file a Form I-526... based upon the EB-5, U.S. Immigration Investor program."

38.     What the PPM neglected to disclose fully was the relationship of Ruby and Lubin as control persons of Golden Lamp, the conflicts of interest that these relationships caused and that no documents signed by anyone could legally or ethically waive such conflicts.   While the Wickizers provided the patina of experienced real estate developers in the Mountain West independent of Lubin and Ruby, they both ceded control of the Project and Golden Lamp to Red Leaf, Ruby and Lubin.

**Formation, TEA Certification, Offering & Capital Structure (2014–2016)**

39.     DMPT was organized in Virginia on August 25, 2014, to serve as the investment vehicle for the Project. At the time of its organization, DMPT's original stated purpose was to develop a mixed-use tower and redevelop the historic El Jebel Shrine Temple at 1775 Sherman Street in Denver, Colorado into a family entertainment center.

40.     On February 9, 2015, Colorado authorities issued a TEA Certification Letter confirming that the Sherman Street census tract in which the El Jebel Shrine was located qualified as a "Targeted Employment Area," thus reducing the EB-5 investment minimum for investors from $1,000,000 to $500,000 and allowing for the count of indirect jobs for EB-5 purposes.

41.     In early 2015, each of the Defendants contributed to the content or ultimately approved of the contents of the PPM and attendant documents (LP Agreement, Subscription Agreement, Escrow Agreement, and Waivers) for circulation to prospective investors in Vietnam and elsewhere.   With respect to Washington First, the precise terms of the Project's escrow agreement were based upon Washington First's own investigation of the bona-fides of the Project

13

and undertakings by the Lubin/Ruby Defendants to comply with its terms. The PPM represented the projected total costs of the Project to be $154.9 million, with EB-5 investors supplying $29 million of mezzanine financing (58 investors × $500,000) plus $50,000 in administrative fees per individual investor ultimately going to Golden Lamp, Mercan Group, JPM and/or AIIL.

42.    At the time Plaintiffs invested in the Project, the Lubin and Ruby Defendants led Plaintiffs to believe that their investment would carry a senior lien interest in the real estate of the Project in the event of default. What the Luby/Rubin Defendants did not tell them was that their participation actually was the condition precedent for the procurement of a lender senior to them who would instead maintain the predominant lien in the real estate of the Project.

43.    The PPM reviewed and approved by all Defendants as to its content represented to prospective EB-5 investors that DMPT's deployment of money into the Project would create approximately 782 direct and indirect jobs, sufficient to support 58 investors with a "cushion," and that capital contributions would remain "at risk" for EB-5 purposes but returned after immigration milestones.

44.    The PPM approved by all Defendants also represented that DMPT operated in cooperation with Golden Lamp, a USCIS-designated regional center, and that "each prospective investor shall file a Form I-526 … based upon the EB-5, U.S. Immigration Investor Program." While Golden Lamp appeared in the PPM to be managed by the Wickizers, it was in reality controlled by Lubin through Ruby.

45.    AIIL, Lubin, Ruby assisted others in pitching or they themselves pitched the Project to investors in Vietnam and elsewhere, simultaneously promoting merits of the Project while serving as immigration counsel for its investors. Presentations included renderings, job-creation

charts, and claims of government support. See Marketing Materials annexed hereto as ***Exhibit "11."***

46.     The Limited Partnership Agreement ("LPA") for the Project (annexed hereto as ***Exhibit "12"***) required among other things:

- o  §10.1: maintenance of "books and accounts," which was not done in any organized fashion, if at all;
- o  §10.2: annual reports to limited partners, which were not provided regularly; and,
- o  §10.3: provision of tax returns to partners, which reflected phantom income on non-existent investment returns for which investors sustained tax liabilities.

47.     Each Plaintiff executed a Subscription Agreement (copy attached hereto as ***Exhibit "13"***) on or around February 6, 2015, investing $500,000 and paying $50,000 in administrative fees. Lubin, on behalf of Red Leaf, signed the agreements, which contained "conflict waivers" unenforceable under Virginia attorney ethics rules given his and AIIL's several roles with the Project through Red Leaf, AIIL's role as immigration counsel to investors, and Lubin's and Ruby's status as control persons of Golden Lamp, among other things.  See ***Exhibit "13,"*** *supra.*

48.     These waivers reflected the overall knowledge of each Defendant, given their review and approval of the PPM and its attendant documentation such as the LPA, the waivers, Subscription Agreement and Escrow Agreement, that Lubin and Ruby were irreconcilably conflicted from serving the multiple roles they represented as theirs, thus rendering all signed documents for the Project voidable and unenforceable under Virginia's Rules of Professional Conduct.

49.     In 2016, DMPT acquired the Temple and land for $12,375,000.   Misleading investor reports approved by Golden Lamp, Lubin and Ruby highlighted this purchase as evidence

of significant progress towards EB-5 benefits when in fact, the purchase of the land was not significant given the lofty goals of job creation and profitability peddled to EB-5 investors.

**Representations of Progress & Contradictions (2017–2021)**

50.    Unbeknownst to Plaintiffs and others, the Lubin/Ruby Defendants started to use the Project as a medium for improper, inexplicable transactions between and among ***other EB-5 projects*** in which they were involved.  Only in 2025 did Plaintiffs learn that on July 14, 2017, $1 million of their funds were diverted to ML Healthcare, another EB-5 project in which some or all of the Lubin/Ruby Defendants were involved.  The involvement of these Defendants in ML Healthcare bore the same or similar conflicts of interest as the Project. Other improper payments and transfers began to flow regularly through the Project's bank accounts at Lubin's instigation. Lubin caused hundreds of thousands of dollars to be transferred to Mercan Group. Since JPM and Mercan Group share the same CEO, this presented irreconcilable conflicts of interest given JPM's status as a control person of Red Leaf.    This conflict was not disclosed to investors either.

51.    In 2018, the Lubin/Ruby Defendants' pattern of payments and use of the Project as a piggy bank and ATM continued.  On June 12, 2018, $3.2 million was transferred from the Project to ML Healthcare.  The Project then received (a) $1,609,326.25 from FRBH LP, which was the EB-5 project managed by Red Leaf and Lubin for the rehabilitation of the old Kansas City Reserve Bank and (b) $1.6 million from LLI, LLC, which purportedly served as the "general contractor" for the Project.

52.    In 2019, Defendants continued unabated to facilitate money transfers and other transactions that clearly violated the "use of funds" requirements of the EB-5 Program.

53.     Atlantic Union Bank knew at all times that the purpose of the Escrow Accounts and other bank accounts established by Lubin, Ruby and AIIL were to facilitate the disposition of funds in accordance with the rules and regulations of the EB-5 Program.  Atlantic Union Bank knew that this was the case with the Project as it approved of Lubin's purported checks and balances for the handling of tens of millions of dollars of investors' funds.  Notwithstanding this knowledge, Atlantic Union Bank failed in its supervision of the Escrow Account for the Project as well as other accounts wherein Lubin had authority or control to dispose of millions of dollars for matters unrelated to the Project with nothing more than a telephone.

54.     Between 2018 and 2019, DMPT upon the review and approval of the Lubin/Ruby Defendants distributed or caused to distribute to EB-5 investors false and misleading progress updates on the Project, claiming that "Temple construction is now well underway," citing historic preservation approvals and sequencing (Temple first and the Tower later).  See Investor Updates at ***Exhibit "14"***.

55.     Each of the Lubin/Ruby Defendants knew or had reason to know that these communications to Plaintiffs and others were false and misleading each time that they were made, given these diversions of funds.  Each of the Lubin/Ruby Defendants knew or had reason to know of the falsity or misleading nature of these communications to Plaintiffs and others by way of their own intimate involvement in the day-to-day progress and lack of oversight of expenditures in the Project as officers, directors and/or control persons of DMPT, Golden Lamp and/or Red Leaf.  Each of the Lubin/Ruby Defendants knew or had reason to know that the Project was wallowing in an overly-ambitious business plan that it could not possibly meet either financially or chronologically.

56.    Far from the claims of nearly 800 jobs for EB-5 benefits, these misleading updates instead predicted that only four EB-5 investors could file I-829 petitions in 2019 (based on 40 jobs) and others could do so by 2021–2023, implying sufficient job creation of nearly 800 jobs.  Each of the Lubin/Ruby Defendants knew or had reason to know that these representations were false and misleading each time that they were made.  Again, the Lubin/Ruby Defendants each knew or had reason to know of the falsity of these representations by way of their own intimate involvement in the day-to-day progress of the Project and oversight of expenditures in the Project as officers, directors and/or control persons of DMPT, Golden Lamp, Red Leaf or any combination of them.

57.    The truth of the ongoing failures of the Project came to roost later in 2019.  At that time, the Lubin/Ruby Defendants circulated or caused to circulate to Plaintiffs a Revised Business Plan ("RBA") increasing costs of the Project from $154.9 million to $183.37 million, as well as revising the occupancy rate of the Tower to 120 condominiums and 180 hotel rooms (hereinafter the "Shrunken Tower"). Critically, the RBA contained contradictory statements that were intended to lull and mislead EB-5 investors in the Project such as Plaintiffs into inaction when they could have removed Lubin and his cadre of crooks from continued involvement had they known what was concealed from them.

58.    By 2020, the Lubin/Ruby Defendants knew that since they controlled just about every aspect of the Project, they could act with impunity in facilitating self-dealing transactions. The Lubin/Ruby Defendants' acknowledgement of their carte-blanche transactional capabilities is evidenced by legal expenditures of questionable import, namely (a) Ruby's wife being retained by the Project (and on information and belief, other EB-5 projects managed by Ruby and Lubin infected with similar self-dealing) to perform legal services and (b) AIIL and Lubin paying

themselves $30,000 in legal fees for the Project from investor funds from the Kansas City Reserve Banking Project.

59.     Among others, one section of the RBA disclaimed reliance on jobs from the Shrunken Tower, while another stated jobs from the Shrunken Tower would be "significant" and necessary. These inconsistencies were not disclosed to investors as material EB-5 risks but instead as false assurances of pending "success" of the Project.

60.     These matters addressed in the RBA qualified as "material changes" that *required* reporting to USCIS by Golden Lamp but were not so reported on the advice of Ruby, Lubin or AIIL because doing so would have revealed the irreconcilable conflicts between and among the entities that were ultimately controlled by Ruby and Lubin.  Instead, AIIL, Ruby and Lubin submitted petition materials for EB-5 investors knowing full well that the entities they controlled had successfully lulled the EB-5 investors into inaction.

61.     But the Project changed yet again by 2021 in the Second Revised Business Plan ("SRBA").  At this time, the Shrunken Tower was scaled down yet again to 30 stories with 120 apartments and 5,000 sq. ft. of retail space (hereinafter the "Further Shrunken Tower"). *No* construction contracts or financing commitments were provided for the Further Shrunken Tower. Like the changes in 2019 to the Tower, these changes in 2021 to the Shrunken Tower qualified as "material changes" that required reporting to USCIS by Golden Lamp but were not so reported on the advice of Ruby, Lubin or AIIL because doing so would have revealed the irreconcilable conflicts between and among the entities of the Project and others whose funds were commingled with them, all ultimately controlled by Ruby and Lubin.

19

62.     AIIL, Ruby and Lubin needed to keep the ruse going so that Plaintiffs and other investors in the Project would not take steps to remove them from what was now clearly a failing, mismanaged development project utterly lacking in any internal controls whatsoever.   As discovered by Plaintiffs upon receipt of the forensic report commissioned by Lubin in early 2025, their funds were leaving bank accounts for the Project at an alarming rate for payments to affiliated entities without any real construction progress in return.

**USCIS Consequences and Immigration Harm**

63.     Plaintiffs' I-526 petitions were initially approved based on misrepresentations of job creation regarding the Project that AIIL, Lubin and Ruby caused to file with USCIS that were then unknown to Plaintiffs.  These failures, combined with (a) the irreconcilable conflicts between and among the Lubin/Ruby Defendants, along with (b) commingling of funds by the Lubin/Ruby Defendants with other similarly infected EB-5 projects under their control, doomed any reasonable likelihood of success for EB-5 investors in the Project but were not disclosed to Plaintiffs.  These failures in disclosure were exacerbated by the continued mismanagement of the Project and the campaign to lull EB-5 investors into inaction undertaken by Lubin, Ruby and AIIL in providing rosy investor updates known by each of them to be false when made.

64.     By 2022–2023, USCIS issued Requests for Evidence ("RFEs"), Notices of Intent to Deny ("NOIDs"), and denials to EB-5 investors in the Project.  Among the reasons cited for the denial of benefits included (a) insufficient job creation, (b) failure to document job creation, (c) a premature asset sale, (d) material changes in the RBA and SRBA regarding the Tower and Shrunken Tower that had failed to be disclosed by Lubin/Ruby Defendants to USCIS as required under the regulations of the EB-5 Program, and (e) unexplained expenditures under the watch of

Washington First (which became Atlantic Union Bank), including those for ML Healthcare.  See *Exhibit "15"* (a representative denial letter.)

65.     Plaintiffs were initially shocked to hear about these matters from USCIS given the glowing reports that had been provided to them by Lubin, Ruby and AIIL for years.  Defendants refused to confess to their conduct and in fact doubled-down in their dishonesty, promising even more EB-5 benefits to come from the Project.

66.     So tangled was the financial web spun by Defendants that in a last-gasp effort to appeal to USCIS to allocate jobs to investors in the Project, Lubin hired a forensic accountant to untangle the finances of his failed fiefdom.  That forensic report, made available to Plaintiffs in January 2025, served as notice of the miasma that the Lubin/Ruby Defendants created with the substantial assistance of Atlantic Union Bank.  See *Exhibit "16"*.  Plaintiffs became aware that those appeals failed later in 2025.  See *Exhibit "17"*.

**Books & Records Demands; Transparency Failures (2022–2025)**

67.     In light of the RFEs and NOIDs sent to EB-5 investors in the Project, on June 22, 2022, twelve Plaintiffs (the "Concerned LPs") demanded from DMPT its (a) 2019–2022 financials, (b) balance sheets, (c) P&Ls, (d) tax returns, (e) bank statements, and (f) job-creation proof. They invoked LPA §§10.1–10.3, Va. RULPA §50-73.8, and 8 C.F.R. §103.2(b)(1). DMPT either ignored these demands completely or provided a small portion of such documents.

68.     In what can only be characterized as flailing attempts to continue the ruse that he, AIIL and Ruby instigated, from 2023–2025, Lubin circulated memos (e.g., April 22, 2025) promising "pre-construction in 2025" and "well over 600 jobs" in DMPT, failing to disclose that, among other things, (a) the Temple had been sold, (b) no Tower, Shrunken Tower or Further

Shrunken Tower existed, (c) there were still irreconcilable conflicts of interest that could not be waived despite efforts to do so, (d) Ruby had left AIIL, (e) that the failures of Ruby, Lubin and AIIL at every juncture to notify USCIS of material changes in the Project as regulations of the EB-5 Program required, rendered any efforts to reclaim EB-5 benefits a pyrrhic quest and, (f) that Lubin was facing disciplinary action by the Virginia Bar for the mishandling of funds in another EB-5 project in which Red Leaf was involved.

69.     Worse yet, Lubin in flailing correspondence to USCIS, sought to claim jobs from the ML Healthcare project to be counted towards job creation for the Project.  Given that the ML Healthcare development had actually concluded in 2019, there was no reason whatsoever for Lubin to make this claim other than to justify in hindsight the misappropriation of funds from Plaintiffs and other investors in the Project.

70.     In fact, in a recent meeting convened by Lubin in September 2025 with investors in the Project, he appeared to still control the Project, continued to represent that the Project would create jobs and that it would be completed.  None of the omissions in prior communications were meaningfully addressed in this September 2025 meeting, nor did he disclose his upcoming appearance before the Virginia Bar for misconduct.

**Conflicts of Interest and Professional Misconduct**

71.     Lubin controlled DMPT (issuer), Red Leaf (General Partner of DMPT and developer of the Project), RJC (undisclosed successor General Partner of DMPT), AIIL (immigration counsel/promoter), and simultaneously served as attorney to investors, the Project and its General Partner.  On information and belief, AIIL also served as counsel to Golden Lamp.  These conflicts were structural, non-waivable, and purposely concealed from EB-5 investors, including Plaintiffs.

72.     Golden Lamp, as the Project's EB-5 regional center under the control of Ruby and Lubin at the acquiescence of the Wickizers, repeatedly endorsed overly optimistic job-creation methodologies and brazen PPM representations regarding the Project in order to lull EB-5 investors into inaction to remove Red Leaf and others from control of the Project, all along ignoring the requirements of full and complete disclosure of irreconcilable conflicts (including but not limited to those involving the hiring of his wife as an attorney for the Project) and subsequent material changes that destroyed the Project's compliance with EB-5 regulations.  All these failures to disclose and misrepresentations of the true (and horrific) state of affairs violated Lubin's duty of candor to his clients.

**Pattern of Misconduct Across Projects**

73.     Plaintiffs are not alone in making sense of the wreckage of an EB-5 project gone wrong in which Ruby, Lubin and AIIL were the ringleaders.  In another recent case filed in this Court, *Hong et al. v. Mississippi Regional Development Center, LLC et al.*, E.D. Va. Case No. 1:25-cv-01216, 14 Vietnamese investors allege misuse of $8.25 million in a Gulfport, Mississippi hotel project.  The allegations—misrepresentations of viability, job creation, and fund deployment—closely track Defendants' conduct here.

74.     Lubin also faces Virginia State Bar disciplinary proceedings (VSB Docket Nos. 24-053-132345 and 24-053-130896) for failing to disclose conflicts in another EB-5 matter, where his firm represented investors while holding interests in the project entity.  In these proceedings, Lubin's license to practice law is in severe jeopardy.

75.     On information and belief, there are several other EB-5 projects in which Lubin, Ruby and AIIL have been involved while violating Virginia's attorney ethics laws, namely Rule 1.8 of its Code of Professional Responsibility, regarding the conflicts of interest of attorneys and

that virtually all of the conflicts caused by wearing multiple hats in the case are *per se* void under Virginia law.

**Conflicts of Interest and Professional Misconduct**

76.     Further, Lubin simultaneously controlled DMPT and Red Leaf, marketed the Project through AIIL, and served as immigration counsel to investors, the Project and its Red Leaf simultaneously—creating non-waivable conflicts under Virginia Rule of Professional Conduct 1.8(h).

77.     Golden Lamp, as the Regional Center acting through Lubin and Ruby with the acquiescence of the Wickizers, wrongfully endorsed bogus job-creation methodologies it knew to be as such and lent its USCIS designation while ignoring conflicts and later material changes that destroyed EB-5 compliance and thus any reasonable hope for Plaintiffs and others to obtain EB-5 benefits.  Golden Lamp also acquiesced and approved of improper fund transfers in violation of the EB-5 Program, and engaged in its own self-dealing by, among other things, approving payment of legal fees to Ruby's wife without any disclosure to investors.

78.     Ruby was an actual control person of Golden Lamp.  Lubin was a de facto control person of Golden Lamp who used Ruby as his proxy.  Both Lubin and Ruby served in these roles with the full approval of its control persons, the Wickizers.  These conflicts too were non-waivable under Virginia's Rule of Professional Conduct 1.8 (prohibiting purported limitations on malpractice liability, among other things).

**Injury to Plaintiffs**

79.     Plaintiffs reasonably relied on Defendants as fiduciaries given their special knowledge about the Project, its inner workings and compliance with the complexities of the EB-5 Program.  Plaintiffs thus collectively invested approximately $9.35 million, inclusive of

"administrative fees" that were in part wrongfully retained by AIIL to provide legal services to investors it could not ethically provide.  Plaintiffs received no return of any capital that Defendants originally presented as a near certainty.

80.    Among other things, Defendants' collective misconduct included:: (a) structural conflicts of interest; (b) misrepresentations and omissions in offering materials and updates; (c) self-dealing transfers and sale of the Temple; (d) withholding of financial records; (e) failure to construct the tower or create jobs; (f) false assurances to investors after the Project had collapsed; and (g) supervisory failures.

81.    Plaintiffs have been damaged in an amount no less than their full investment, plus fees, interest, and consequential immigration harms.

## CAUSES OF ACTION

### COUNT I: RESCISSION UNDER § 29 OF THE
### SECURITIES EXCHANGE ACT OF 1934
### (Against All Defendants)

82.    Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth herein.  To the extent required by governing law, this Cause of Action is pled in the alternative.

83.    Section 29(b) of the Securities Exchange Act of 1934 ("1934 Act") provides for rescission of contracts that violate federal securities laws.

84.    Defendants, through AIIL, Ruby and Lubin acting on behalf of DMPT and/or Golden Lamp, concealed, minimized, and misrepresented irreconcilable conflicts of interest, including pursuit of waivers and releases for such conduct, all made with scienter and in connection with the purchase or sale of securities.   Under Virginia law, each and every contract made in violation of its Rules of Professional Conduct are subject to rescission.

85.     Defendants' misrepresentations and omissions include, but are not limited to, (a) specific statements made in 2015 offering documents promising 782 qualifying jobs, (b) capital return after immigration milestones, (c) EB-5 compliance through Golden Lamp's sponsorship; (d) 2018–2019 investor updates claiming Temple construction was underway and predicting imminent I-829 approvals;  (e) 2023–2025 written memos to Plaintiffs promising "pre-construction in 2025" and "well over 600 jobs," and (f) assurances of internal controls at each level in the venture (such as supervision over funds in escrow) which in fact permitted irreconcilable conflicts and fund transfers in violation of the EB-5 Program which would preclude any award of immigration benefits.  Each of these communications was false when made and omitted material facts about conflicts of interest and the lack of any viable project plan.  Defendants thus acted with scienter regarding each and every one of the misrepresentations and omissions stated herein.

86.     Plaintiffs reasonably relied on these misrepresentations and omissions to their detriment. Such conduct constitutes securities fraud under Rule 10b-5 and Section 20(a) of the 1934 Act.

87.     Further, to the extent that any entity is or was not registered to conduct business as required by law, those contracts are also void as a matter of law.

88.     Thus, each contract relating to Plaintiffs' investments in the Project, including but not limited to (a) the payment of funds to Golden Lamp from Plaintiffs' administrative fees, (b) the retention of AIIL for Plaintiffs' administrative fees, (c) subscriptions of Plaintiffs for investments in the Project, (d) Red Leaf's contract with the Project, (e) Lubin's contract with Red Leaf, (f) successor or assumption of agreements of Red Leaf by RJC, (g) Ruby's contract with Golden Lamp, (h) the Escrow Agreement and (i) all engagement letters between AIIL and Red

Leaf, DMPT and Golden Lamp, to the extent any funds of investors flowed to aforementioned

contracting parties, are *all* voidable and subject to rescission under §29(b) of the 1934 Act.

### COUNT II: VIOLATIONS OF SECTION 10(b) AND RULE 10b-5; CONTROL-PERSON LIABILITY UNDER § 20(a)
**(Against DMPT, Red Leaf, RJC, Lubin, Atlantic Union Bank and AIIL; § 20(a) against Lubin, Red Leaf, RJC and JPM)**

89.    Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth

herein.  To the extent required by governing law, this Cause of Action is pled in the alternative.

90.    Through the 2015 PPM, LPA, Subscription Agreements, and subsequent written

updates, DMPT, Red Leaf (and later RJC), Lubin, Atlantic Union Bank and AIIL made or caused

to be made material misstatements and omissions in connection with the offer and sale of DMPT

securities. These included but are not limited to:

    a. Promises of approximately 782 jobs sufficient for 58 investors;
    b. Representations that capital contributions would remain "at risk" but returned after immigration milestones;
    c. Assertions of EB-5 compliance through Golden Lamp's sponsorship;
    d. Meaningful and compliant banking oversight to prevent commingling of funds that would jeopardize EB-5 benefits; and
    e. Concealment or minimization of non-waivable attorney and GP conflicts.

91.    Each of the named defendants in this cause of action acted with scienter, or so

recklessly as to constitute scienter, by among other things (a) disregarding that the Project's job

plan was contradicted by their own revisions, (b) ignoring conflicts that were structural and non-

waivable, (c) engaging in self-dealing, (d) engaging in transactions prohibited under the EB-5

Program and (e) failing to disclose material transactions, understanding and knowing that investors

would rely on these misstatements and omissions.

92.    Plaintiffs relied on these misstatements and omissions, which were the cause of damages of at least $9.35 million and in some cases, the loss of priceless immigration benefits.

93.    Lubin, as managing member of Red Leaf and principal of AIIL, and Red Leaf and RJC, as General Partners of DMPT, are liable to Plaintiffs as control persons under § 20(a). Likewise, JPM was a control person of Red Leaf and is also liable as a control person under §20(a).

94.    Lubin, Red Leaf, JPM and RJC exercised actual power and control over DMPT and AIIL, including the authority to prepare, approve, and disseminate offering materials, investor communications, and compliance certifications. Lubin personally directed the solicitation of investors and the management of DMPT's assets. Lubin and AIIL chose to represent investors, the Project, Red Leaf and RJC simultaneously when it was illegal to do so. Likewise, JPM is liable as a control person of Red Leaf. Accordingly, each of these parties may be held liable as control persons under Section 20(a) of the 1934 Act.

## COUNT III: BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

95.    Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth herein. To the extent required by governing law, this Cause of Action is pled in the alternative.

96.    The Lubin/Ruby Defendants owed fiduciary duties as general partners, control persons, and attorneys to manage Plaintiffs' investments in good faith, free from conflicts, self-dealing, and waste by way of their expertise in real estate development and immigration matters.

97.     They each breached these duties by fostering, concealing, and minimizing irreconcilable conflicts of interest, failing to provide required reports and records, and misrepresenting EB-5 compliance.

98.     Likewise, Atlantic Union Bank owed Plaintiffs a fiduciary duty to confirm that the terms of its Escrow Agreement were being followed in accordance with its knowledge of the intended purposes of the accounts Lubin handled and over which he had signatory and funds transfer authority.

99.     Plaintiffs were damaged in at least $9.35 million. The breaches were wrongful, dishonest, malicious and warrant punitive damages.

### COUNT V: VIRGINIA BUSINESS CONSPIRACY (Va. Code §§ 18.2-499 -500) (Against All Defendants)

100.     Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth herein.  To the extent required by governing law, this Cause of Action is pled in the alternative.

101.     Defendants through meetings and communications with others in the Commonwealth of Virginia combined, agreed, and mutually undertook to injure Plaintiffs in their property interests in the Project by promoting EB-5 investments riddled with undisclosed conflicts, concealing risks, and acting in bad faith.

102.     Each Defendant had an independent personal financial stake in the conspiracy.

103.     Plaintiffs are entitled to treble damages, interest, and attorneys' fees under Virginia law.

## COUNT VI: CIVIL CONSPIRACY
### (Against All Defendants)

104.    Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth herein.  To the extent required by governing law, this Cause of Action is pled in the alternative.

105.    Defendants each conspired to conceal irreconcilable conflicts of interest and misrepresent the Project's viability and necessary internal controls as to demonstrate compliance with the EB-5 Program. Each of these parties committed overt acts in furtherance of this conspiracy, depriving Plaintiffs of their rights and concealing their misconduct.

106.    Plaintiffs incurred damages of not less than $9.35 million as a direct and proximate result.

## COUNT VII: VIOLATION OF VIRGINIA'S CONSUMER PROTECTION ACT
### (Against the Lubin/Ruby Defendants)

107.    Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth herein.  To the extent required by governing law, this Cause of Action is pled in the alternative.

108.    Plaintiffs are consumers under the VCPA, as Lubin/Ruby Defendants were engaged to assist them in acquiring immigration benefits.

109.    The Lubin/Ruby Defendants engaged in unlawful, unfair, or fraudulent practices, including misrepresenting job creation, EB-5 compliance, and concealing conflicts.

110.    Plaintiffs have suffered at least $9.35 million in losses. The Lubin/Ruby Defendants' conduct was fraudulent, malicious, and oppressive, entitling Plaintiffs to punitive damages.

## COUNT VIII: LEGAL MALPRACTICE
### (Against AIIL, Ruby and Lubin)

111.    Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth herein.  To the extent required by governing law, this Cause of Action is pled in the alternative.

112.    Ruby, Lubin and AIIL simultaneously represented Plaintiffs as immigration counsel while controlling Project entities, creating non-waivable conflicts. Each of them directly or indirectly benefited through self-dealing transactions from bank accounts of the Project.

113.    They failed to disclose these conflicts, failed to advise on EB-5 compliance and source-of-funds risks, and failed to protect Plaintiffs' interests.

114.    This conduct constitutes malpractice that proximately caused Plaintiffs' damages.

## COUNT IX: MONEY HAD AND RECEIVED
### (Against AIIL, Golden Lamp, and DMPT)

115.    Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth herein.  To the extent required by governing law, this Cause of Action is pled in the alternative.

116.    Defendants AIIL, Golden Lamp, and DMPT received Plaintiffs' funds under void or voidable agreements infected by irreconcilable conflicts.

117.    It would be unjust for Defendants to retain these funds; equity requires restitution with interest and the imposition of a constructive trust.

## COUNT X: ACCOUNTING
### (Against All Defendants)

118.    Plaintiffs reallege and incorporate all preceding paragraphs as if fully set forth herein.  To the extent required by governing law, this Cause of Action is pled in the alternative.

119.    The interrelationships and accounts among Defendants are complex and opaque.

120.    An accounting is necessary to determine the financial condition, use of funds, and any proceeds traceable to Plaintiffs' investments.

## DEMAND FOR JURY

121.    Plaintiffs demand a jury trial for determination as to all causes of action as herein alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

1.  Rescission of each of their $500,000 investments from DMPT as provided under Virginia common law and/or federal securities laws; or

2.  In the alternative, judgment against the Defendants for compensatory damages in an amount no less than $9.35 million, which includes return of (a) all administrative fees paid to Golden Lamp and (b) all legal fees paid to AIIL;

3.  Imposition of a constructive trust or equitable lien on all assets or property owned or controlled by DMPT, Red Leaf, RJC and Golden Lamp attributable to Plaintiffs; and

4.  A judgment in favor of Plaintiffs and against Defendants for their costs of suit incurred herein; and,

5.  A judgment in favor of Plaintiffs and against Defendants for any and all pre-judgment interest and post-judgment interest according to proof; and,

6.  A judgment awarding punitive damages to Plaintiffs and against Defendants as permitted by the laws of the Commonwealth of Virginia in an amount to be determined according to proof at trial; and,

7. A judgment in favor of Plaintiffs and against Defendants awarding treble damages of at least $28.05 million as may be permitted under the VCPA, or punitive damages of the same amount;

8. For an accounting; and,

9. Attorneys' fees awardable pursuant to Securities Exchange Act §29(b) and Virginia Business Conspiracy statute, and VCPA; and

10. The immediate appointment of a Receiver over at least AIIL, RJC and Red Leaf, if not all the Lubin/Ruby Defendants, so that any judgment obtained in this case is not rendered ineffectual; and,

11. For such other and further relief as the Court deems just and proper.

Dated: December 2, 2025

Respectfully Submitted,

All Plaintiffs
By Counsel

IMPRESA LEGAL GROUP

_/s/ George E. Kostel_____
George E. Kostel, Esq. (VSB # 34757)
Richard K. Kelsey, Esq. (VSB # 44232)
Impresa Legal Group
3101 Wilson Blvd., Suite 500
Arlington, VA 22201
Tel: (703) 842-0660
Email:  georgekostel@impresalegal.com
Email:  richkelsey@impresalegal.com

LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.

/s/ Robert V. Cornish, Jr.
Robert V. Cornish, Jr.  (*Pro Hac Vice to be filed*)
680 South Cache Street, Suite 100
P.O. Box 12200
Jackson, WY 83001
Email: rcornish@rcornishlaw.com
Tel: (307) 264-0535

*Counsel for Plaintiffs*