IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| PHAN MINH TRANG, *ET AL.*, | ) ) ) | |
| *Plaintiffs* | ) ) ) | Case No. 1:25-cv-02248-AJT-WBP |
| v. | ) ) | |
| DMPT, LP, *ET AL.*, | ) ) ) | |
| *Defendants.* | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, eighteen foreign investors, bring claims under the Securities Exchange Act,

Virginia state law, and the common law[1] against Robert Lubin, Paul Ruby, associated business

entities (collectively with Lubin and Ruby, the "Business Defendants") and Atlantic Union Bank

("AUB" or the "Bank Defendant") for engaging in an alleged fraudulent scheme to solicit and

misappropriate millions of dollars of investments under the U.S. Immigrant Investor Program,

also known as the "EB-5 Program." Pending before the Court are the Business Defendants'

Motions to Dismiss for Improper Venue, or alternatively, to Compel Arbitration ([Doc. Nos. 22,

44] (the "Arbitration Motions"),[2] and AUB's Motion to Dismiss for failure to State a Claim.

---

[1] Specifically, the Complaint brings nine claims (each of which is against all Defendants unless otherwise specified): (1) rescission Under § 29 Of The Securities Exchange Act Of 1934; (2) violations Of Section 10(B) And Rule 10b-5; Control-Person Liability Under § 20(A) (Against DMPT, Red Leaf, RJC, Lubin, Atlantic Union Bank And AIIL; § 20(A) Against Lubin, Red Leaf, RJC and JPM); (3) breach of Fiduciary Duty; (4) violation of the Virginia Business Conspiracy (Va. Code §§ 18.2-499-500); (5) civil conspiracy; (6) violation Of Virginia's Consumer Protection Act (Against the Lubin/Ruby Defendants); (7) legal Malpractice (Against AIIL, Ruby and Lubin); (8) money had and received (Against AIIL, Golden Lamp, and DMPT); and (9) accounting. Several of Plaintiffs' causes of action are misnumbered in the Complaint, so the Court will refer to them according to their actual place in the sequence.

[2] Each group of Business Defendants consists of an individual and one or more of their affiliated businesses. The first group is comprised of Robert Lubin and his affiliated entities DMPT, LP; Red Leaf Development, LLC; RJ Capital, LLC; and AIIL (collectively, the "Lubin Defendants"). [Compl.] ¶¶ 19, 20, 23, 24. The second group is comprised of Paul Ruby and Golden Lamp Regional Center, LLC (the "Ruby Defendants"). The Business

[Doc. No. 15] (collectively with the Arbitration Motions, "the Motions"). The Court held a hearing on the Motion on February 25, 2026, following which it took the Motions under advisement. For the reasons stated below, the Motions are **GRANTED.**

## I. BACKGROUND

The Business Defendants are five companies, each of which was in some way associated with Lubin and/or Ruby (the "Individual Defendants") and involved in facilitating the Plaintiffs' investments in a real estate development and management project through the EB-5 Program. [Compl.] ¶¶ 19-28. This program provides a mechanism for obtaining legal permanent residency in the United States to qualified foreign nationals who invest at least $500,000 in a new commercial enterprise that creates at least ten full-time jobs for U.S. workers in targeted employment areas. *See* 8 U.S.C. § 1153(b)(5)(A)(ii). The project in question was the redevelopment of multiple parcels of land at or near 1770 Sherman Street in Denver, Colorado (the "Project"); the site previously housed a mosque and was proposed to be redeveloped into a family entertainment center and a mixed-use high-rise building (the "Tower"). [Compl.] ¶¶ 1, 39; [Doc. No. 1-2]. Plaintiffs, seventeen Vietnamese nationals and one Indian national, were each induced into investing $500,000 in capital in the Project, along with administrative fees of $50,000 to Defendant Golden Lamp Regional Center, LLC ("Golden Lamp"), based on promises that the Project was a lucrative investment opportunity that would secure for them the immigration benefits available through the EB-5 program. [Compl.] ¶ 3. They allege that these promises were purposefully misleading and were part of a scheme to induce them to invest in a project that was doomed from its inception. *Id.* ¶¶ 2-4.

---

Defendants also filed a Motion to Stay Discovery pending a ruling on the motions to compel arbitration, which the Court granted at the February 25 hearing. [Doc. No. 65].

The parties' transactions had a complex structure, but central to the alleged scheme are the Individual Defendants. Lubin is an immigration attorney and founder of Defendant American International & Immigration Law Group, P.C. d/b/a Robert Lubin & Associates, P.C. ("AIIL"), which provided Plaintiffs with immigration law services during the relevant period. *Id*. ¶ 24. In addition to serving as immigration counsel, Lubin's role in the alleged conspiracy included "(a) marketing, operating, and managing the Project and its manager, … [and] (c) serving as corporate and securities counsel for the Project. *Id*. ¶ 8. Ruby was Lubin's then-partner in AIIL, who also served as immigration counsel for the Plaintiffs and a director of Golden Lamp. *Id*. ¶ 9. The allegations in the Complaint also reflect significant coordination between Ruby, Lubin, and the other Business Defendants in connection with the transactions. See *infra* at 7–8. AUB is sued as successor in interest to Washington First Bank, which served as the escrow agent for the parties' investment transaction and maintained an account for DMPT but does not appear from the allegations to be otherwise affiliated with either Lubin or Ruby or the other Business Defendants. *Id*. ¶ 25.

As Plaintiffs allege, EB-5 Regional Centers, such as Golden Lamp, coordinate the investments of EB-5 investors into a "pooled entity" and "[e]ach of the EB-5 investors are ultimately limited partners in the pooled entity that is lending money to the Project." *Id*. ¶ 33. For the purposes of such an investment, in early 2015, Defendants prepared, reviewed, or approved certain promotional materials for the project, as well as a packet of several documents which would constitute the agreements between the parties (the "Formation Documents");[3] and

---

[3] The Formation Documents consist of the following:
  i. A Limited Partnership Agreement ("LP Agreement"; [Doc. No. 1-13]), which formed the DMPT Limited Partnership with Red Leaf as General Partner and Plaintiffs as Limited Partners.
  ii. A Subscription Agreement [Doc. No. 1-14], which served as the sale of securities effecting the transfer of $500,000 investment and $50,000 in administrative fees.

the individual Defendants participated in investor presentations to promote the Project in

Vietnam. *Id*. ¶¶ 36, 41, 45-46. Over the course of 2015,[4] the parties executed the Formation

Documents, including the Subscription Agreements in or around February 2015 (*Id*. ¶¶ 47-48),

and, with one exception, the various Plaintiffs executed the LP Agreement between June and

November 2015.[5] [Doc. No. 43-1].

Plaintiffs allege that beginning in 2017, the Business Defendants began using the

Project's bank accounts to transfer investor funds to other EB-5 projects and affiliated entities,

transactions that Plaintiffs allege were unauthorized, undisclosed, and unrelated to the Project,

while continuously misrepresenting the financial health of the Project.[6] [Compl.] ¶¶ 3, 4, 50, 54-

59; 66-70. In reality, the Project was allegedly headed for foreclosure, as a result of which

Plaintiffs lost significant sums of money as well as the promised immigration benefits. *Id*. ¶¶ 63-

64.

## II. STANDARD OF REVIEW

Before the Court are two types of motions: AUB's motion to dismiss pursuant to Rule

12(b)(6) and the Business Defendants' two motions to dismiss for improper venue or compel

arbitration.

---

iii.    Each subscription agreement contained as an appendix a conflict waiver form wherein Plaintiffs acknowledged and consented to the conflicts of interest posed by Lubin and Ruby's various roles in the project (the "Conflict Waivers"). *Id*. at 7.

iv.    An Escrow Agreement [Doc. No. 16-1] wherein Plaintiffs and the Escrow Agent agreed to the terms by which their funds would be held and then released to DMPT or returned to a Plaintiff, depending on the outcome of that Plaintiff's immigration application. *Id*. at 4.

[4] The Pleadings do not reflect a full accounting of exactly which documents were executed on which dates.

[5] The sole exception is that Plaintiff Amita Mahajan whose LP Agreement was executed in June 2018. [Doc. No. 43-1] at 17.

[6] Specifically, Plaintiffs allege several transactions or groups of transactions: first, on July 14, 2017, $1 million of project funds was allegedly transferred to another EB-5 project, ML Healthcare, which was controlled by some of the same Defendants ([Compl.] ¶ 50). In 2018, an additional $3.2 million was allegedly transferred from the project to ML Healthcare (*Id*. ¶ 51). The Project then received transfers from other EB-5 projects, including FRBH LP and LLI, LLC, which Plaintiffs allege demonstrates commingling of investor funds (*Id*. ¶ 51). Finally, Lubin allegedly caused hundreds of thousands of dollars to be transferred to Mercan Group, an entity sharing common leadership with a control person of Red Leaf (*Id*. ¶ 50).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This does not require detailed allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. (quoting *Twombly*, 550 U.S. at 555). "When a . . . complaint contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim, it is unnecessary for the pleader to descend into statements giving details of proof in order to withstand [a motion to dismiss]." *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 517 (2014) (quoting *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24 (1993)). The Court must accept all well-pled facts in the complaint as true and construe all facts in the light most favorable to Plaintiffs. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

"A motion to dismiss for improper venue based on an arbitration agreement should be treated as a motion to stay pending compelled arbitration. *See Noe v. City Nat'l Bank*, 828 Fed. Appx. 163, 166 (4th Cir. 2020) (per curiam) ("the district court should have treated the Bank's motion [to dismiss] as a motion to stay the litigation.") (citing *Choice Hotes Int'l, Inc. v. BSR Tropicana Restort, Inc.*, 252 F.3d 707, 709-710 (4th Cir. 2001)); *see also Southern Coal Corp. v. IEG PTY, LTD.*, 2016 U.S. Dist. LEXIS 24853 at *7 (E.D. Va. February 26, 2016) (explaining why a motion to compel arbitration is preferred over a motion to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3)). When considering a motion to compel arbitration, unlike with a motion to dismiss under Rule 12(b)(6), it is "appropriate—indeed necessary—to consider materials outside the pleadings." *De Jesus-Israel v. U-Haul Co. of Virginia*, 571 F. Supp. 3d 490, 494 n.3 (E.D. Va. 2021) (*quoting Artis v. Lyon Shipyard, Inc.*, No. 2:17cv595, 2018 WL 2013073

5

(E.D. Va. Apr. 26, 2018)). The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Absent such grounds, "courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019).

### III. DISCUSSION

### 1. The Business Defendants' Arbitration Motions

The Business Defendants contend that all the claims asserted in this action are governed by the valid arbitration agreement in Section 17.11(c) of the LP Agreement ([Doc. No. 1-12] §§17.11(a)-(c)), which, under section 2 of the FAA, must be enforced absent grounds for revocation that apply to contracts generally (which they contend do not apply here).[7] In that regard, Section 17.11(a) of the LP Agreement defines a "Dispute" as "any dispute, controversy or claim  arising out of or in connection with, or relating to, this Agreement [the LP Agreement] or any breach or alleged breach of this Agreement."  Section 17.11(c) provides that any unresolved Dispute will be "resolved by binding arbitration in Reston, Virginia pursuant to the Commercial Arbitration Rules of the AAA."[8] *Id*.

---

[7] In addition to signing the LP Agreement, each Plaintiff contemporaneously with their investments executed a Subscription Agreement in which they acknowledged their receipt of and agreement to the Project's Confidential Offering Memorandum ("PPM") and Formation Documents, one of which was the LP Agreement. [Doc. No. 1-13] ¶¶ 4, 11.

[8] Section 17.11(a) provides that the parties shall first attempt to resolve any Dispute through negotiation. Section 17.11(b) of the LP Agreement provides that any Dispute unresolved through the negotiation process in Section 17.11(a) shall be submitted to a mediation service; and if that mediation is unsuccessful, then arbitration pursuant to Section 7.11(c). None of the parties have argued that at this point the Dispute resolution process in either Section 7.11 (a) or (b) continues to apply; and the only issue they have presented is whether the Plaintiffs' claims should be resolved in this Court on through arbitration.

### A. Plaintiffs' Claims Against the Defendants Do Not Fall Outside the Arbitration Provision

Plaintiffs contend that all their claims are outside the scope of the arbitration clause because DMPT, the limited partnership itself, was voluntarily dismissed as a Defendant and the remaining Business Defendants were non-signatories to the LP Agreement.[9] In that regard, Plaintiffs contend based on the definition of a Dispute that arbitrable claims are limited to "a breach of contract claim or claim of breach of fiduciary duty regarding the affairs of DMPT," [Doc. No. 40] at 6. As an initial matter, among Plaintiffs' claims are claims against Red Leaf, DMPT's general partner and Lubin, Lead's managing partner, both signatories to the LP Agreement, who appear to be proper party Defendants for "a breach of contract claim or claim of breach of fiduciary duty regarding the affairs of DMPT." In any event, Plaintiffs' limiting gloss on the scope of the arbitration clause is directly at odds with any reasonable reading of the LP Agreement's expansive definition of a Dispute. *See Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001) ("[A] broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a "significant relationship" exists between the asserted claims and the contract in which the arbitration clause is contained.").

Likewise, compelling arbitration is proper with respect to Plaintiffs' claims against non-signatories to the LP agreement. The circumstances in which a plaintiff can be compelled to arbitrate against a non-signatory include when "claims against the non-signatory were intimately founded in and intertwined with a contract containing an arbitration clause" and where non-

---

[9] Plaintiffs also argue that Defendants have failed to show that the LP Agreements were signed by any of the Plaintiffs. However, the Lubin Defendants have submitted copies of the fully-executed signature pages to the LP Agreement, the authenticity of which Plaintiffs have not challenged and which, like the LP Agreement itself, the Court may consider on a motion to compel arbitration. [Doc. No. 43-1].

signatories are agents of the corporate signatory who "control all of the activities of the corporation." *Long v. Silver,* 248 F.3d 309, 320 (4th Cir. 2001). Here, although Red Leaf as the limited partnership's general partner and Lubin, as Red Leaf's managing member, were the only Business Defendants to sign the LP Agreement, the factual allegations in the Complaint clearly allege that all of the Business Defendants (including DMPT), as well as Plaintiffs' claims against the Business Defendants, are so intertwined with one another that enforcement of the arbitration agreement with respect to claims against all of them is appropriate. In that regard, the Complaint alleges that the Individual Defendants jointly controlled Golden Lamp (and by extension DMPT, which served as the investment vehicle for the Project) ([Compl.] ¶ 2) and jointly developed the Project's marketing materials and Confidential Offering Memorandum ("PPM")[10] (*Id.* ¶¶ 2, 36, 47; see also [Doc. Nos. 1-11, 1-12]); Lubin and Ruby jointly perpetrated the misappropriation of funds from the Project accounts ([Compl.] ¶¶ 50-52) and the Business Defendants engaged in numerous other joint actions to further the conspiracy. *See id.* ¶¶ 44, 54, 60. Lubin is the founder and owner of AIIL. (*Id.* ¶ 23) and "a *de facto* control person of Golden Lamp (*Id.* ¶ 26); Ruby "served as a Director of Golden Lamp in oversight of the Project…and served as Lubin's proxy to conduct the affairs of Golden Lamp." (*Id.* ¶ 27); Golden Lamp "is controlled by Lubin through Rubin as its President."  (*Id.* ¶ 28); and RJ Capital assumed the role of general partner of DMPT on January 1, 2023, with Lubin as its general Partner. (*Id.* ¶ 21).

### B. Plaintiffs' Consent and Fraudulent Inducement Arguments Do Not Void the Arbitration Agreement.

Plaintiffs next argue that the Business Defendants' alleged deceit or other wrongdoing that induced their entering into the LP Agreement voids the arbitration clause, invoking the FAA's "saving clause," which provides that courts may decline to enforce a contract clause

---

[10] The various parties use different names for this document, but all use the acronym PPM.

"upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. That conduct allegedly constituting the fraudulent inducement includes Lubin's alleged violation of his ethical obligations as an attorney under the Virgina Rules of Professional Conduct[11] and the many alleged misstatements about the Project.

Dispositive of this contention is that the factual allegations in the Complaint or elsewhere do not allege, as required to avoid an arbitration clause, that fraudulent misrepresentations or other alleged wrongful conduct induced Plaintiff's to enter into the arbitration provision specifically, as opposed to the LP Agreement itself. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967) (generally, "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud"). Consequently, any claim that the LP Agreement was fraudulently or improperly induced, through whatever means, falls within the scope of the arbitration agreement for the arbitrator to decide. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024) ("[i]n cases where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration").[12]

---

[11] Specifically, the Complaint alleges that Lubin and AIIL simultaneously served in the following multiple, irreconcilable roles, which constituted conflicts of interest: as immigration counsel for Plaintiffs; as corporate and securities counsel for the Project; as manager or control person of DMPT's general partner; and as de facto controller of Golden Lamp as sponsor of the Project. [Compl.] ¶¶ 8-9, 24, 26-27. Plaintiffs allege that these overlapping roles created non-waivable conflicts of interest under Virginia professional-conduct rules that were concealed or minimized through unenforceable conflict waivers. *Id*. ¶¶ 8-9, 48.

[12] Plaintiffs' contention fails for other reasons as well. First, Courts applying Virginia law have repeatedly held that an attorney's ethical breach in and of itself does not form the basis for any civil liability, even where ethical breaches entail or accompany malpractice or other liability. *Swango v. Virginia State Bar ex rel. Second Dist., Section I Comm.*, 304 Va. 373, 396 (2025) ("[V]iolating the Rules of Professional Conduct, in and of itself, does "not give rise to a cause of action nor should it create any presumption that a legal duty has been breached"). Even

### C.  Defendants Did Not Waive the Right to Compel Arbitration

Lastly, Plaintiffs contend that the Lubin Defendants waived or forfeited any right to arbitrate by failing to raise the issue in a related case.[13] [Doc. No. 40] at 11–13. But "[s]imply failing to assert arbitration as an affirmative defense does not constitute default of a right to arbitration." *See Forrester v. Penn Lyon Homes, Inc.*, 553 F.3d 340, 343 (4th Cir. 2009) (quoting *Am. Recovery Corp.*, 96 F.3d at 96).

For the above reasons, all of Plaintiffs' claims against all the Business Defendants fall within the scope of the arbitration provision of the LP Agreement.

### 2. <u>AUB's Motion to Dismiss for Failure to State a Claim</u>

Defendant AUB has filed a motion to dismiss under Rule 12(b)(6) on the grounds, *inter alia*, that the claims against it are barred by the terms of the parties' Escrow Agreement, and do not otherwise plausibly allege a cognizable claim against it.[14] [Doc. No. 15].  Specifically, AUB contends that Plaintiffs failed to plead facts which would render it plausible that Washington

---

if such a breach were included in the FAA's saving clause, the factual allegations in the Complaint do not plausibly allege a breach of Rule 1.8, which appears to be the Rule most applicable to Plaintiffs' claims since to violate this rule, *inter alia*, the attorney must not have given the client a reasonable opportunity to seek separate legal counsel on the transaction, and the client must not have consented in writing. Va. R. Pro. Conduct 1.8 (a)(2), (a)(3). Neither the Complaint nor Plaintiffs' Oppositions to the Arbitration Motions allege that Plaintiffs were not given such an opportunity, and the language in the Subscription Agreement's conflict waiver section (which conflicts Plaintiffs admit consenting to in writing; [Compl.] ¶ 47) states that Plaintiffs were given the opportunity to seek independent counsel in accordance with Rule 1.8. [Doc. No. 43] at 7; see also [Doc. No. 1-13]. Likewise, contrary to Plaintiffs' contention at the hearing that legal malpractice claims cannot be subject to binding arbitration, courts have found no impediment to arbitrating such claims. *See Meuse v. Henry,* 296 Va. 164 (2018) (confirming arbitration award that encompassed legal malpractice claim); *see also Sanford v. Bracewell, LLP*, 841 Fed. Appx. 397, 399 (affirming District Court order compelling arbitration of, *inter alia*, legal malpractice claim).

[13] Although this argument was raised only as to the Lubin parties and there is no indication that the Ruby parties were involved in the related litigation, the Court's conclusion would not change even if it were construed as applying to all parties.

[14] Plaintiffs bring six claims against AUB: Rescission (Count I), violations of § 10(B) and Rule 10b-5, and control person liability under § 20(a) (Count II), Breach of Fiduciary Duty (Count III), Virginia Business Conspiracy (Va. Code §§ 18.2-499 -500) (Count IV), Civil Conspiracy (Count V), and Accounting (Count IX). AUB argues, and Plaintiffs do not oppose, that the Accounting cause of action is a remedy asserted derivatively to and in conjunction with the substantive counts, and thus may be dismissed if the substantive claims are dismissed. [Doc. No. 16] at 1 n.1 (citing *Walsh v. Bank of Am., NA*, No. 1:11-cv-1168-AJT-JFA, 2012 U.S. Dist. LEXIS 190987, at *4 (E.D. Va. Feb. 15, 2012) ("A claim for an accounting is not an independent cause of action, but rather an equitable remedy") (citation omitted).

First either (a) made any material misrepresentations to induce Plaintiffs to enter the escrow agreement, as required to bring their securities fraud claims (Counts I, II), or (b) knowingly combined with the Lubin and Ruby Defendants to unlawfully injure Plaintiffs, as required to sustain their conspiracy claims (Counts IV, V). AUB also contends that because it is sued solely in its capacity as successor to Washington First bank as Plaintiffs' and DPMT's escrow agent, the language of the escrow agreement which each Plaintiff signed (See [Compl.] ¶ 47) bars all of Plaintiffs' claims against it. [Doc. No. 16] at 10.

Section 2 of the Escrow Agreement, which is attached to AUB's Motion and can be considered as intrinsic to the Complaint as to AUB,[15] contains the following terms that limit the Escrow Agent's liability:

a) Escrow Agent undertakes to perform only such duties as are expressly set forth herein, and no implied agreements or obligations shall be read into this Agreement against Escrow Agent;

b) Escrow Agent shall not be responsible in any manner whatsoever for any failure or inability of DMPT, or of anyone else to deliver the U.S. Investments, or any other funds to Escrow Agent or otherwise to honor any of the provisions of this Agreement or any other agreement;

c) Escrow Agent shall be fully protected in acting on and relying upon any written notice, direction, request, waiver, consent, receipt or other paper or document which Escrow Agent in good faith believes to have been signed or presented by the proper party or parties;

d) Escrow Agent shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law, or for anything that it may do or refrain from doing in connection herewith, except its own bad faith, willful misconduct or gross negligence; . . .

e) Escrow Agent makes no representation as to the validity, value, genuineness, or collectability of any security, document, or instrument held by or delivered to it. . .

---

[15] See, e.g. *Decoster v. Becerra*, 119 F.4th 332, 336 n.1 (4th Cir. 2024) ("When deciding a motion to dismiss under Rule 12(b)(6), the court does not consider extrinsic evidence. The court may consider however, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the documents are integral to the complaint and there is no dispute about the documents' authenticity") (citation omitted).

[Doc. No. 16-1] § 2. AUB argues that Plaintiffs have failed to plausibly allege that Washington First did not fully perform its duty as Escrow Agent in compliance with the terms of the Escrow Agreement: they point specifically to the fact that the Plaintiffs' I-526 petitions had been approved, which was the condition for releasing Plaintiffs' escrowed funds to DMPT. [Doc. No. 16] at 10 (citing [Doc. No. 16-1] § 5(a)). It likewise contends that Plaintiffs have failed to allege facts plausibly alleging any claims that could survive the application of these provisions in Section 2 or make them unenforceable. In response, Plaintiffs contend that because their Complaint alleges that the bank(s) conspired with the other Defendants to defraud them in violation of the federal securities laws, their claims should otherwise be permitted under the Escrow Agreement's bad faith and gross negligence carve-outs. [Doc. No. 37] at 11–12.

To plead a violation of Section 10(b) and its implementing Rule 10b-5, a securities fraud Plaintiff must allege, *inter alia,* "a material misrepresentation or omission by the defendant; [and] scienter." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (citation omitted). Furthermore, the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4 "PSLRA") imposes a pleading standard that is even higher than Fed. R. Civ. P. 9(b)'s elevated standard for ordinary fraud claims: a Plaintiff must plead, with respect to at least one authorized corporate agent "facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007).

Unlike the numerous allegations about specific misrepresentations made by Lubin, Ruby, and their associated organizations, there is nothing in the Complaint that can reasonably be construed as alleging a misrepresentation or scienter on the part of AUB or Washington First. The only conduct attributed to Washington First before the Plaintiffs' execution of the LP

Agreement is the conclusory allegation that it "contributed to the content or ultimately approved of the contents of the [Escrow Agreement] … based upon [its] own investigation of the bona-fides of the Project and undertakings by the Lubin/Ruby Defendants to comply with its terms" ([Compl.] ¶ 41), and because Washington First reviewed and approved of the PPM and its attendant documentation, it therefore knew that "Lubin and Ruby were irreconcilably conflicted from serving the multiple roles they represented as theirs." *Id*. ¶ 48. But as reflected in the Escrow Agreement's liability limitations themselves, Washington First told the Plaintiffs that it made no representation as to Lubin and Ruby's abilities or the validity of any of the securities being sold. [Doc. No. 16-1] §§ 2(b), 2(e). And the allegation that AUB knew Lubin and Ruby were "irreconcilably conflicted" also flies in the face of the language of the LP Agreement, which appears to establish that Lubin and Rubin complied with their ethical obligation to disclose conflicts and obtain Plaintiffs' written consent after being given the opportunity to seek independent counsel. *See* [Doc. No. 1-14] at 7.

Nor do Plaintiffs allege facts plausibly showing a conspiracy between the bank(s) and any of the Business Defendants.[16] To plead either statutory or common law conspiracy, a plaintiff must "allege that the defendants combined together to effect a 'preconceived plan and unity of design and purpose.'" *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003) (citing *Bull v. LogEtronics, Inc.*, 323 F. Supp. 115, 131 (E.D. Va. 1971)). In this respect, Plaintiffs rely on Washinton First's review of the PPM and attendant documents and several conclusory statements such as that the bank "knowingly facilitated the regular and improper use of Plaintiffs' money by Defendants." [Compl.] ¶ 25. Plaintiffs also

---

[16] This is both the basis for dismissal of Plaintiff's conspiracy claims against AUB (Counts IV, V) and also further grounds for dismissal of their securities fraud claim (Count II), as the absence of a conspiracy means that none of the misrepresentations made by Lubin or Ruby may be be attributed to AUB.

13

point to a forensic accountant's analysis showing several purportedly suspicious transactions in

DMPT's Washington First bank statements (not alleged to be associated with the escrow account

itself), including one transfer of funds to what they contend was another Lubin/Ruby EB-5

project. [Opp.] at 14 (citing [Doc. No. 1-17] at 16). However, these allegations do not plausibly

allege, or even allude to, a preconceived plan or unity of purpose between the bank(s) and the

Lubin/Ruby Defendants as required to plead a conspiracy, but rather appear related to Plaintiffs'

claim that AUB "failed in its supervision of the Escrow Account for the Project as well as other

accounts wherein Lubin had authority." [Compl.] ¶ 53.

But that "failed supervision" assertion does not plausibly allege the required gross

negligent in performing escrow services. In that regard, the duty of care owed by an escrow

agent is a fact-dependent inquiry chiefly informed by the terms of the governing escrow

agreement. *See In re Potomac Supply Corp.*, No. 12-30347-BFK, 2014 WL 1661288, at *10

(Bankr. E.D. Va. Apr. 24, 2014), aff'd sub nom. *Chesapeake Bay Enters., Inc. v. Pillsbury*

*Winthrop Shaw Pittman, LLP*, No. 3:14CV00633-HEH, 2014 WL 6685494 (E.D. Va. Nov. 25,

2014), aff'd sub nom. *Chesapeake Bay Enter., Inc. v. Pillsbury Winthrop Shaw Pittman LLP*, 606

F. App'x 130 (4th Cir. 2015) ("*Subject to any agreement with the principal*, an [escrow] agent

has a duty to the principal to act with the care, competence, and diligence normally exercised by

agents in similar circumstances") (emphasis added; cleaned up). Plaintiffs fail to plead facts

plausibly alleging that AUB or Washington First owed them a duty of care to "review the

documentation and transaction context reflected in the PPM and related agreements, ensure that

releases matched the escrow's purpose and conditions, and then manage related operating

accounts consistent with the plan." [Opp.] at 13–14. Rather, the Escrow Agreement reflects that

the escrow services were narrow in scope (namely, to hold the funds and then release them to

DMPT upon occurrence of a specific event) and did not encompass a general duty to vet DMPT's activity in its escrow or non-escrow accounts. [Doc. No. 16-1] § 5.

In sum, Plaintiffs' gross negligence theory appears to be based primarily on a purported extra-contractual duty of care that the bank(s) owed to the Plaintiffs, but Plaintiffs fail to adequately square that claim with the contractual nature of its relationship with Plaintiffs as an escrow agent. *See In re Potomac Supply Corp.*, 2014 WL 1661288, at *10 ("[I]n an escrow arrangement, the parties occupy a principal-agent relationship, a relationship which is essentially contractual in nature") (quoting *Winslow, Inc. v. Scaife*, 219 Va. 997, 1000, 254 S.E.2d 58, 60 (1979)); *see also Old Republic Nat'l Title Ins. Co. v. Tyler* (*In re Dameron*), 155 F.3d 718, 723 (4th Cir. 1998) ("An escrow arrangement, like all express trusts, is a contractual relationship") (quoting *Winslow,* 219 Va. at 1000) (cleaned up).[17]

For the above reasons, the Complaint fails to allege facts that plausibly allege any material misrepresentation made by Washington First that induced Plaintiffs to enter the Escrow Agreement, or scienter on the part of either AUB or Washington First (as required for the securities fraud claims); and also fails to plausibly allege the existence of a conspiracy between AUB or Washington First and the Lubin/Ruby Defendants.[18] As such, the claims against AUB must be dismissed.

---

[17] In support of their contention concerning AUS' extra-contractual duty of care, Plaintiffs cite to *Union First Mkt. Bank v. Bly*, No. 3:13-CV-598-JRS, 2014 U.S. Dist. LEXIS 15071 (E.D. Va. Feb. 6, 2014), but that case concerns a non-escrow agency relationship, contrasts an escrow agent's duties with the more expansive duties of a fiduciary. *Id.* at *3.

[18] The parties have asserted other grounds in support of their positions. AUB asserts numerous other grounds to dismiss, including that the claims are time-barred and fails adequately to plead specific acts taken by the banks in furtherance of the alleged conspiracy. [Doc. No. 16] at 5–10, 15–20. Plaintiffs also contend that the structural conflict waivers on which the Bank relied were void as having been procured by concealment and therefore cannot bar claims. [Doc. No. 37] at 12. However, given the Court's disposition of Plaintiffs' claims against the Bank, any further consideration of these grounds is unnecessary.

## IV. CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that the Arbitration Motions be, and the same hereby are, **GRANTED**; and Plaintiffs are directed to proceed with arbitration with respect to all their claims against the Business Defendants in accordance with Section 17.11(c) of the Limited Partnership Agreement; and it is further

**ORDERED** that Plaintiffs' claims against the Business Defendants be, and the same hereby are, **STAYED**, pending completion of any arbitration proceedings under Section 17.11 of the LP Agreement and that the parties advise the Court of the outcome of any arbitration proceedings within 5 days of their completion; and it is further

**ORDERED** that Defendant Atlantic Union Bank's Motion to Dismiss [Doc. No. 15] be, and the same hereby is, **GRANTED**, and the claims against it be, and the same hereby are, **DISMISSED**.

The Clerk is Directed to forward copies of this order to all counsel of record and to place this case on the inactive docket.

April 13, 2026
Alexandria, Virginia

_____
Anthony J. Trenga
Senior U.S. District Judge

16